UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANE DOE, suing by and on behalf of her minor daughter, "A.N." | : : : |
| VS. | : NO. 3:02CV780(CFD) |
| EAST HAVEN BOARD OF EDUCATION | : : FEBRUARY 26, 2006 |

### PLAINTIFF'S SUPPLEMENTARY POST-TRIAL MEMORANDUM

The evidence in this case was sufficient to support the jury's conclusion that the defendant had actual knowledge that the plaintiff was the victim of gender-based harassment and that, with such knowledge, was deliberately indifferent to the rights of the student at risk from such harassment. Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998); Bruneau v. South Kortright Central School District, 163 F.3d 749 (2d Cir. 1998).

The first witness to testify at the trial of this action was Maxine Wilensky, Senior Assistant State's Attorney in the Judicial District of New Haven, who handled the prosecutions of Jonathan Toro and Robert Demars for sexually assaulting the victim in this case. (5/2/05 Transcript, pp. 58-59) She testified that they were arrested pursuant to arrest warrants, which meant that the police after conducting an investigation had written up a warrant establishing probable cause, that their work then had been reviewed by a prosecutor who had concluded that probable cause existed that the crime had been committed by the persons in question, and that the document then had been reviewed by a judge for the same purpose and only after

1

the judge agreed that probable cause existed to believe they had committed those crimes was the warrant issued.  (Id., p. 63) They were arraigned in court on April 22, 2002.  (Id., pp. 79-80)  On May 6, 2002, she wrote a letter to the East Haven Superintendent of Schools pointing out that these men were charged with committing the crime of sexual assault in the first degree against the plaintiff yet were continuing to attend the same school as she.  State's Attorney Wilensky explained that she had received reports that the victim had been "harassed and subjected to intimidating behavior as a result of her disclosure concerning the alleged sexual assault.  The actions were perpetrated by fellow students and took place on school property."  (Id., p. 67) As a result, State's Attorney Wilensky that same day sought and obtained a court order prohibiting the rapists from having any further contact with the victim.  (Id., pp. 68-72) She notified the Superintendent of Schools of those court orders by letter written May 9, 2002, and received on May 13, 2002.  (Id., p. 74)[1]

    Lisa LaPenna, the victim's mother, testified that in 2002 her daughter was a freshman at East Haven High School, where she was a straight-A student, and her son was a junior at the same school.  (Id., p. 98) On March 25, 2002, she received a telephone call from her son screaming that her daughter had been raped by two other students.[2]  She hurried to the school.  (Id., pp. 99-100, 107) She found the

---

[1] Eventually both were convicted of compelling the victim to submit to sexual assault by the use of force against her, a Class C felony.  (Id., pp. 74-76)

[2] The two rapists actually were "bragging in school" about what they had done.  "[H]e heard it because they were bragging about it."  (Id., p. 171)

victim there in the school's administrative offices, with school officials. (Id., pp. 101-02) Her daughter was crying. Eventually an East Haven police detective arrived. (Id., p. 102) In the presence of the assistant principal and guidance counselor, she described the rape to the detective. (Id., p. 103)

The victim returned to school the next day and returned at the end of the day in tears. (Id., pp. 106-07) She had called home twice that day, crying and upset. This continued on a daily basis. (Id., pp. 108-09) The victim's mother began calling school officials at least three or four times every week, informing those officials that the victim was coming home from school every day crying and reporting that people in the school "are calling her a slut, a douche bag, a liar. The rapists are in front of her every day. I kept on asking why do you have a rapist still in your school." (Id., p. 109) She made these calls during the very first week after the victim had disclosed the rape. (Id., p. 110) She called the Superintendent of Schools himself "because I couldn't take it anymore with my daughter coming home crying." He did not speak to her and would not return her calls, but she left messages with his secretary, as well as speaking directly to the school principal and other school officials, explaining "that my daughter was being harassed in their school. And the two rapists were still in her school and I wanted to know why and what they were going to do for her." (Id., pp. 111-12)

School officials ignored her. The Superintendent refused to return her calls despite her request. The principal also refused to take or return her calls, so she visited the school to speak with him. When she did so, "he didn't show me any concern. What he wanted to talk about was the fact that my son had broken the

3

chair in the office." (Id., pp. 113-14) "I told him that my daughter was coming home crying every day from school, that she couldn't attend her classes. What were they doing or what could we do. His only response was about the chair. He wanted to talk about suspending my son for breaking the chair." But when she asked him what he was doing about the rapists and why were they still in school and not suspended, he responded that "[t]hey had a right to their education." (Id., p. 115) She asked the principal about the victim's rights. "What about her rights. She's a high honor student. What about her education is what I said." He gave her no response. (Id., pp. 115-16)

      She also complained on a daily basis to Mrs. Melillo, the guidance counselor who was the defendant's designated representative in this case. She complained that the victim was "being called a slut, a liar, a douche bag. That she just slept with two boys. And these two boys are rapists running in the school. She can't go to her classes. She's a high honor student. There was nothing [Mrs. Melillo] could do to help her....She could only have her sit in the room." (Id., p. 118) The victim was unable to attend classes "because of the berating that she had to endure. This douche bag, the slut, the liar.[3] A tennis ball thrown at her head, threats that were made to her. She had to sit in the guidance counselor. It was her only choice." (Id., p. 120) Mrs. Melillo herself informed the victim's mother that the victim was being

---

[3] "There was a lot of filthy names she was called. I didn't say all of them...." (Id., p. 156) "The other students...were calling her the cock sucker, the bitch, the liar, the douche bag." (Id., p. 218)

harassed in her classes, "that she was called names, and that she was threatened by the students...." (Id., p. 123)

The victim's mother went directly to the principal about the threats and specifically asked him that the students who threatened the victim be removed from class so the victim could attend. He refused to do that. He refused to remove the students who threatened the victim, but instead removed the victim from her classes. "He said I have options. She could stay in the guidance counselor, she could do home schooling, or she could have the security guard with her all day in school. And I said why should she have home schooling. Why should she have a security guard. Why not take two people who raped somebody and take them out of school and leave the ones who haven't committed a crime, let them keep learning, let her have her life. Let her be a teenager in high school." His response was to state that the rapists "had a right to their education." (Id., p. 124)

The victim's mother also discussed with Mrs. Melillo an incident in which one male student threw a tennis ball against the victim's head in the presence of one of the rapists. (Id., p. 126) She also reported this incident to the principal, who had no response. (Id., pp. 127-28)

On April 10, 2002, the day after the rapists were arrested, the New Haven Register featured a front-page article, with photographs of the rapists, reporting "that...two East Haven students were arrested for raping a 14-year-old student in East Haven High School." (Id., pp. 131, 189, 221) Those newspapers were delivered in large quantities to the high school. The victim's mother telephoned the principal and asked him "if he could please hold the papers, do not let the students

5

have them. And he said it was their First Amendment right." (Id., p. 131) Not only were the newspapers permitted into the school in bulk, "the teachers read the article out loud to classes." (Id., p. 145) The impact upon the victim of his permitting these papers to be circulated in the school "was just devastating. There was no controlling the situation....[the victim] progressively emotionally got worse and worse. It was like being raped all over again...." (Id., p. 132) "My daughter wanted to kill herself at one point. I had to take her to the emergency room because it got so bad she couldn't stay in school anymore....I just figured if the papers were just held it wouldn't have been so bad." (Id., p. 133) At that point, feeling that she "had to call a lawyer to help protect my daughter," she retained counsel. (Id., pp. 133, 135) As a result, the present lawsuit was filed at 12:11 p.m. on May 6, 2002. (Id., pp. 135-36) The suit was served on the Superintendent of Schools on May 8, 2002. (Id., p. 138) The rapists, however, remained in the high school for several additional weeks. (Id., p. 142) They in fact remained in school until after a hearing was conducted in this case in open court. (Id., p. 143; 5/3/05 Transcript, p. 21) "[A]fter a little while of them being out of school, within a few days, it was easier. She had more friends....more people at least said hello instead of calling her names. And she was able to go to her classes." (5/2/05 Transcript, p. 145)

      The exclusion from the total high school experience which the defendant imposed upon the victim in this case, for no reason other than that she was a victim, significantly affected the victim's life. "[T]here's no telling what she could have accomplished going to East Haven had she could go to school every day like every kid does, like she does today, going in school and enjoying it, studying hard. She

wants to be a doctor. You know, ... she has these dreams. And in East Haven it was just taken away from her. It was disrupted. She was removed form her class. She was removed from the environment. She didn't get the stimuli that all the other students were able to get. She wasn't stimulated by a teacher. Her work was here's a pile of work sent to her and sat in front of her." (Id., p. 146) And even isolated from the school environment in the guidance office, there were "two or three times where she was supposed to be secluded and protected in this room that [one of the rapists] would walk in and talk to the secretary about what they're doing for prom, how graduation is going to go, in front of my daughter. He raped my daughter and he's sitting there. And I would tell this to...Dr. Smith and Mr. DeFelice, Alicia, I'd tell it to everybody. Nobody listened. Nobody would listen." (Id., pp. 147-48) In fact, the high school actually had a "crisis resource team" which the administration elected not to employ in the plaintiff's situation until after she had threatened suicide. (Id., pp. 209-11)[4]

      The victim testified that she was born on June 27, 1987. (5/3/05 Transcript, p. 45) She was raped in January 2002. Ashamed and embarrassed, she told nobody about it. (Id., p. 46) In March, however, when her brother confronted her with the fact that the rapists were bragging about it in school, she reported the rape to school officials. (Id., p. 47) Police were summoned and launched an investigation. (Ibid.) Beginning the next day, she was subjected to severe

---

[4] Elaine Mierzejewski, a former assistant principal at the high school who testified as a defense witness, testified that the crisis resource team was used only for "a major thing" and that the rape of this freshman girl did not, in her opinion, fit that category. (5/4/05 Transcript, pp. 22-23)

harassment at school. She immediately reported the harassment to Mrs. Melillo and thereafter gave her a steady stream of reports about the details of harassment inflicted upon her, frequently making those reports in writing. (Id., p. 48) During that first week after her disclosure, she reported several times to Mrs. Melillo that students were calling her "slut, a liar, a bitch, a whore. I sleep with everybody." The students doing this name-calling were girlfriends of the rapists and she reported their names to Mrs. Melillo. (Id., p. 49) Mrs. Melillo advised the victim that she relayed all of this information promptly and directly to the high school principal. (Id., p. 50)

Despite these prompt and detailed reports, nothing whatever was done about the harassment except to tell the victim she could stop attending classes and go "sit in a room if I wanted to...." (Id., p. 51) None of the named perpetrators of the harassment was disciplined in any way during the month of March and none was disciplined in any way during the month of April. (Ibid.)

As time passed, the harassment got worse. From name calling it escalated to physical intimidation and at least one assault. (Ibid.) She reported everything to Mrs. Melillo and explained how awful she felt, but nothing was done. The principal told her that if she didn't like being harassed she could have her choice of staying in the guidance office or having a security guard. Punishing the perpetrators was out of the question. (Id., pp. 52-53) "I felt like no one cared, that I had no one to turn to in that school. Like I was the one that was being punished more." (Id., p. 53)

The day after the rapists were arrested, the newspapers reporting the incident in front page headlines were everywhere in the school. "They even made

copies on the copy machine.  Only the teachers have a password to the copy machine.  They hung it up on the media center door.  It was everywhere.  Substitute teacher read it in class.  It was all over the place." (Ibid.)  This was the only time a newspaper article ever was posted on the media center door.  (Id., p. 54) "The media center door is right when you walk into the school.  Everybody sees it.  No one passes it without seeing it.  And that was the same day that I got the tennis ball thrown at my head." (Ibid.)  That assault was reported by the victim to both Mrs. Melillo and the principal.  (Id., p. 57)

The harassment of the victim extended even into the guidance office to which she had been banished.  Stephanie Redente, who was dating one of the rapists, would come into the office with her friends, sit at the same table as the victim, and pass around pictures of the rapist while talking about "how good of a kid he was...." (Id., p. 57) The victim reported all of this to Mrs. Melillo who, in turn, reported it to the principal.  The principal's response was to suggest that the victim be confined to a windowless room in the back of the guidance suite.  (Id., p. 58)

The result of these weeks of torment was that, for a child who was a top honor student, "[s]chool was the worst part of my life.  I hated going to school.  I never wanted to wake up for school.  I felt like anything that happened didn't matter to anybody.  No teachers that I would tell, nobody.  They never did anything." (Id., pp. 58-59) "I felt like going to school every day I was being raped all over again.  And it was horrible going to school.  What happened in January I'll live with my whole life, but I'll also live with this my whole life." (Id., p. 63)  Only after the Superintendent of Schools was served with this lawsuit did the defendant begin

9

responding to the victim's needs.  (Id., p. 60) "Until I had a lawyer, they didn't act at all."  (Id., p. 66)

Elaine Mierzejewski, a real estate agent formerly employed as an assistant principal at East Haven High School, testified that her only involvement in this matter during the entire month of April was on the morning that the New Haven Register carried an article and pictures of the rapists on its front page.  On that morning, before school had started, she had received a request that the newspapers not be circulated in the school in order to protect the victim.  She conveyed that request to the principal, who ruled that the papers would be circulated in order to protect what he considered to be the newspaper's supposed First Amendment right to be circulated in the school.  (Id., pp. 204-05)

Alicia Mellilo, the designated representative of the defendant in this litigation and formerly a guidance counselor at East Haven High School, testified as a defense witness.  (5/4/05 Transcript, p. 25) She admitted that the fact that brought the victim's rape to light was when one of the perpetrators was overheard bragging about it in school.  (Id., pp. 106-07) She further admitted that she knew at that time that any type of sex between a 14-year-old child and a person aged either 17 or 18 is rape by definition under Connecticut law.  (Id., pp. 105-06) She further admitted that school officials easily could have confirmed if the perpetrators had indeed been bragging about it as reported, simply by calling in and questioning several other students.  (Id., pp. 107-08) She had no knowledge whether that ever was even

attempted.  (Id., pp. 113, 129)[5]  She also had gone to the principal early on the morning that the New Haven Register article appeared, advising him that the newspapers were at the school awaiting distribution, that there was an article about the matter and that the victim "was very upset."  His response was "[t]hat he was aware and they were handling it."  (Id., p. 154)  She had that meeting with the principal early in the morning, before the newspapers had been distributed.  His response was to cause the newspapers to be read in the school on school time by every student.  (Id., pp. 156-57)

Every federal appeals court to consider the question has held "that the requirement that the motion for attorneys' fees 'must be filed no later than 14 days after entry of judgment' is tolled pending the outcome of post-trial motions under Rule 50 or Rule 59."  Bailey v. County of Riverside, 414 F.3d 1023 (9th Cir. 2005), citing Weyant v. Okst, 198 F.3d 311, 314 (2nd Cir. 1999); Members First Fed. Credit Union v. Members First Credit Union of Fla., 244 F.3d 806, 807 (11th Cir. 2001) (per curiam).  The attorney fee motion in this case is timely, although it now will have to be supplemented by the many hours expended since the first motion was filed.

---

[5] The defendant presented no evidence on this topic.

           Respectfully submitted:

_____
      JOHN R. WILLIAMS (ct00215)
      51 Elm Street
      New Haven, CT 06510
      TELEPHONE:  203.562.9931
      FAX:  203.776.9494
      E-MAIL:  jrw@johnrwilliams.com
      Plaintiff's Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Attorneys Hugh F. Keefe and Nancy Fitzpatrick Myers, 52 Trumbull Street, New Haven, CT 06596.

_____
JOHN R. WILLIAMS