# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JANE DOE,                                          :
suing by and on behalf of                    :    Civil Action No.
her minor daughter, "A.N.",              :    3:02 CV 780 (CFD)
    Plaintiff,                        :
                                           :
    v.                                     :
                                           :
EAST HAVEN BOARD OF EDUCATION, :
    Defendant.                      :

## RULING ON POST-TRIAL MOTIONS

The plaintiff Jane Doe, suing on behalf of her daughter, A.N., brought this suit against the East Haven, Connecticut Board of Education.[1]  While A.N. was a student at East Haven High School, she was sexually assaulted by two older students.  The plaintiff alleged that after A.N. reported the assault and those students were being investigated for their involvement, the defendant East Haven Board of Education ("East Haven") failed to protect A.N. from discrimination and otherwise denied her the benefits of a education on the basis of her sex, in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688.[2]  After a five-day trial, the jury returned a verdict in favor of Doe and awarded her $100,000 in damages. Judgment was entered on May 9, 2005.  Pending are the following post-trial motions: (1) the

---

[1] Because this case involved the sexual assault of a minor, the Court granted the plaintiff's motion to proceed in a fictitious name and to refer to the minor child by her initials. See Doc. #4.  The parties agreed to use their real names at trial, which also are recorded in the jury charge and trial transcripts.  To protect A.N.'s privacy, however, the Court will use her initials and her mother's pseudonym in this ruling.

[2] In her initial complaint, the plaintiff also alleged that East Haven had committed the Connecticut common law tort of reckless or intentional infliction of emotional distress, but she withdrew this claim prior to trial.

defendant's renewed motion for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50; (2) the defendant's motion to set aside the jury verdict and judgment; and (3) the plaintiff's motion for attorneys' fees.  The Court heard argument on all post-trial motions on February 10, 2006.

## I.    Background

During the 2001-2002 academic year, A.N. was a fourteen-year-old freshman at East Haven High School.  On or about January 1, 2002, A.N. was sexually assaulted by two East Haven High School seniors, Jonathan Toro and Robert Demars.[3]  A.N. did not report what had happened to her until March 25, 2002, when rumors surfaced at East Haven High School that two seniors had slept with a freshman girl; A.N. then gave a statement to East Haven High School administrators and the East Haven Police Department that she had been raped by Toro and Demars.  A.N. claimed that immediately after she disclosed the details of her sexual assault, she began to suffer sexual harassment at school by many students, including some of her former friends, as well as the friends and girlfriends of Toro and Demars.  This harassment mostly was verbal, though in one instance, a student threw a tennis ball at A.N.'s head.  In another, a male student barked like a dog at A.N. as she walked down a school hallway to her locker.  A.N. began not to attend certain classes in an attempt to avoid the harassment; instead, she would sit in the guidance office during those periods and complete her classwork independently.

Toro and Demars continued to attend East Haven High after A.N.'s March 25 disclosure and after their subsequent arrest on charges of sexual assaulting A.N.,[4] although they eventually

---

[3] These acts took place off the East Haven High School campus, during a school vacation.

[4] The parties did not specify the date of Toro and Demars' arrests, but stipulated that it was shortly before April 22, 2002.

were given homebound instruction beginning sometime in May 2002. The plaintiff filed this lawsuit on May 6, 2002 and the complaint was served on the defendant on May 8, 2002. In March 2003, Toro and Demars pled <u>nolo contendere</u> to charges of sexual assault in the third degree.

## II.    Discussion

Each motion will be evaluated in turn.

### A.    Defendant's Renewed Motion for Judgment as a Matter of Law

Trial commenced in this case on May 2, 2005. At the conclusion of the plaintiff's case-in-chief on May 3, 2005, the defendant made an oral motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The Court denied the motion without prejudice to East Haven renewing it at the close of evidence. On May 6, 2005, the jury returned its verdict in favor of the plaintiff. East Haven thereafter renewed its motion for judgment as a matter of law by a written motion filed on May 16, 2005.

East Haven failed to renew its motion for judgment as a matter of law at the close of all evidence, as required by Fed. R. Civ. P. 50(b). "[W]hen a Rule 50(a) motion made during trial is not granted, the moving party must renew the motion both at the close of the evidence and within ten days after entry of judgment." <u>Pahuta v. Massey-Ferguson, Inc.</u>, 170 F.3d 125, 129 (2d Cir. 1999). The Second Circuit has further held that a party may request judgment as a matter of law post-trial "only if it sought such relief before the jury retired to deliberate under Fed. R. Civ. P. 50(a)(2)," and limits the permissible scope of the later motion to those grounds "'specifically raised in the prior motion for [judgment as a matter of law].'" <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 161 (2d Cir. 2001) (quoting <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12, 14 (2d

Cir. 1993)); <u>see also</u> <u>McCardle v. Haddad</u>, 131 F.3d 43, 51 (2d Cir. 1997) ("In sum, a posttrial

motion for judgment as a matter of law can properly be made only if, and to the extent that, such

a motion specifying the same grounds was made prior to the submission of the case to the jury.").

A party's failure to renew its Rule 50 motion is not waivable, and generally may not be

excused by the district court unless necessary to prevent "manifest injustice." <u>Cruz v. Local</u>

<u>Union No. 3</u>, 34 F.3d 1148, 1155 (2d Cir. 1994). Under most circumstances, then, East Haven's

post-trial motion would be procedurally barred. <u>See, e.g.</u>, <u>Ikram v. Waterbury Bd. of Educ.</u>, 1997

U.S. Dist. LEXIS 14619, *3-*4 (D. Conn. Sept. 9, 1997). Here, however, the plaintiff failed to

object to the timeliness of East Haven's post-trial motion, which allows the district court to

review the sufficiency of the evidence nonetheless. <u>See</u> <u>Weissman v. Dawn Joy Fashions, Inc.</u>,

214 F.3d 224, 232 (2d Cir. 2000). The distinction ultimately is of little moment, as the Court

finds that judgment as a matter of law in favor of East Haven neither is necessary to prevent

manifest injustice, nor warranted under the standard generally applicable to Rule 50 motions.

### 1.    Standard of Review

"If, for any reason, the court does not grant a motion for judgment as a matter of law

made at the close of all the evidence, the court is considered to have submitted the action to the

jury subject to the court's later deciding the legal questions raised by the motion. The movant

may renew its request for judgment as a matter of law by filing a motion no later than 10 days

after entry of judgment . . . ." Fed. R. Civ. P. 50(b). When ruling on such a post-verdict motion

for judgment as a matter of law, a district court may allow the judgment to stand, order a new

trial or direct entry of judgment as a matter of law. <u>Id</u>.

A court may properly grant a post-verdict Rule 50 motion when "there can be but one

conclusion as to the verdict that reasonable men could have reached." Merrill Lynch

Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998) (quoting Samuels v. Air Transport

Local 504, 992 F.2d 12, 14 (2d Cir. 1993)).  In other words, "a Rule 50 motion for judgment as a

matter of law must be granted where '(1) there is such a complete absence of evidence supporting

the verdict that the jury's findings could only have been the result of sheer surmise and

conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that

reasonable and fair minded men could not arrive at a verdict against him.'" Hernandez v. Keane,

341 F.3d 137, 143-44 (2d Cir. 2003) (quoting Newmont Mines Ltd. v. Hanover Ins. Co., 784

F.2d 127, 132 (2d Cir. 1986)).  In making such a determination, a court "must view the evidence

in a light most favorable to the nonmovant and grant that party every reasonable inference that

the jury might have drawn in its favor." Samuels, 992 F.2d at 16.  A court "cannot assess the

weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment

for that of the jury." Id. (quoting Mattivi v. South African Marine Corp., 618 F.2d 163, 168 (2d

Cir. 1980)).  Instead, a court "must defer to the credibility assessments that may have been made

by the jury and the reasonable factual inferences that may have been drawn by the jury."

Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

    In considering the forgoing principles of law, it has been noted that the moving party

bears a "heavy burden" on a post-verdict Rule 50 motion.  Concerned Area Residents for the

Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994); Matthews v. Armitage, 36 F. Supp.

2d 121, 124 (N.D.N.Y. 1999); see also Holt v. Home Depot, U.S.A. Inc., 2004 WL 178604 (D.

Conn. Jan. 22, 2004) (commenting on the "stringent standards that apply to" a post-verdict Rule

50 motion).  Moreover, "[b]ecause a judgment as a matter of law intrudes upon the rightful

province of the jury, it is highly disfavored."  Sabir v. Jowett, 214 F. Supp. 2d 226, 236 (D.

Conn. 2002) (quotations and citations omitted).

### 2.    East Haven's Claims

Title IX provides, in relevant part, that "No person in the United States shall, on the basis

of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any educational program or activity receiving Federal financial assistance."

20 U.S.C. § 1681.  Recipients of federal funds, like the East Haven Board of Education, therefore

may be liable for damages under Title IX for student-on-student sexual harassment.  See

generally Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999).

East Haven claims that it is entitled to judgment as a matter of law due to Doe's failure to

establish any of the three elements required for a successful Title IX peer harassment claim.  The

defendant argues that the plaintiff failed to present any evidence that A.N. suffered sexual

harassment; failed to present sufficient evidence that East Haven had actual knowledge of any

sexual harassment; and failed to present sufficient evidence that East Haven was deliberately

indifferent to A.N.'s reports of harassment.

### a.    Evidence of Sexual Harassment

The Court instructed the jury as follows on the first prong of Doe's Title IX claim:

> In order to find the defendant liable under Title IX for such acts, the plaintiff must
> demonstrate . . . (1) that [A.N.] suffered sexual harassment by her peers that was
> so severe, pervasive, and objectively offensive that it could be said to deprive her
> of access to the educational opportunities or benefits provided by East Haven
> High School.

The Court further specified that "the harassment must have taken place in a context subject to the

Board of Education's control and where the Board of Education possessed the substantial control

6

necessary to take remedial action against the harasser" and noted that Title IX did not reach all

acts of peer harassment:

> Whether gender-oriented conduct rises to the level of actionable "harassment"
> depends on a constellation of surrounding circumstances, expectations, and
> relationships. There is no mathematical formula to determine whether harassment
> is severe or pervasive. In the school setting, students often engage in insults,
> banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to
> the students subjected to it. Damages are not available for simple acts of teasing
> and name-calling among students, even where these comments target differences
> in gender. Damages are available only where the harassment constitutes such
> severe gender-based mistreatment that it denies a victim the equal access to
> education that Title IX is designed to protect.[5]

East Haven claims that the plaintiff's evidence at trial showed only that "the conduct at

issue was motivated by A.N.'s involvement, and possible victimization, in an off-campus sexual

assault and her subsequent report to the police," not that she suffered harassment based on her

gender.

At trial, Jane Doe testified that every day after A.N. reported her sexual assault to East

Haven High School authorities, "she would be crying, she would be upset. She was withdrawn. .

. . I would call the school and I would say [that] my daughter's coming home, she's telling me

that people in school are calling her a slut, a douche bag, a liar." Trans., 5/2/05, pg. 109. Doe

also testified that she told the East Haven High School principal that A.N. was suffering

---

[5] This language comes from the Court's final jury charge. During its deliberations, the
jury sent a note to the Court reading, "We, the jury, would like to request a formal definition of
what sexual harassment is in this case. Perhaps a legal definition as it pertains to this case."
Trans., 5/6/05, pg. 2. After asking counsel to review and comment on the Court's proposed
answer, the Court called in the jury and provided the following response in open court: "Title IX
prohibits discrimination on the basis of sex. That prohibition encompasses intentional sex
discrimination in the form of harassment of a student by another student. You will recall that in
my instructions to you I defined sexual harassment as gender-based mistreatment. The
harassment must be directed against its subject because of that person's sex." Id. at 8.

harassment so severe "that she couldn't attend her classes." Id. at 115.  Doe later elaborated:

> I have firsthand knowledge that my daughter did not attend all of her classes.  She
> could not attend them because of the berating that she had to endure.  The
> [comments like] douche bag, the slut, the liar.  A tennis ball [that was] thrown at
> her head, threats that were made to her.

Id. at 120.  On redirect examination, Doe testified that while A.N. continued to receive good

grades at East Haven High School, "she would always be studying on her own without the

classroom instruction, without [the] stimulus of the educational environment that she had prior to

this. . . .  because of all the harassment she had to go through every day."  Trans., 5/3/05, pg. 37.

During her direct examination, A.N. testified that she was the subject of peer harassment

starting the day after she reported the assault to East Haven High authorities: "A lot of people

were calling me a slut, saying I slept with two boys.  Just nasty names . . . [including] a slut, a

liar, a bitch, a whore.  I sleep with everybody."  Id. at 48-49.  A.N. reported the assault in March

2002; she testified that by April 2002, the harassment had worsened "[b]ecause instead of names,

they would throw a tennis ball at me or I'd have to start walking– when I went to my classes, I'd

walk up the stairs and I'd have to walk by one of them."  Id. at 51.  A.N. began not to attend

certain classes during that semester, and confirmed that, depending on the subject, she accrued

between fourteen and forty-three total absences that year.  Id. at 151-52.  Asked to specify the

precise nature of the harassment she suffered in April 2002, A.N. said

> There are so many incidents, so many fights–not fights but–I spent most of my
> time sitting in the guidance office, but whoever wanted to come in could come in
> and they would–sometimes a girl named Stephanie Redente who dated [assault
> suspect Jonathan] Toro would sit at the table and she would just bring in pictures
> of them and say how good of a kid he was to her friends that sat at the table with
> me.  And I couldn't go– like I couldn't go anywhere.

Id. at 57.

8

A.N. testified that the harassment eventually became so painful to her that on May 2, 2002, she was taken to the emergency room after threatening to kill herself: "School was the worst part of my life. I hated going to school. I never wanted to wake up for school. I felt like anything that happened didn't matter to anybody. No teachers that I would tell, nobody. They never did anything." Id. at 58-59. Asked to distinguish the feelings she experienced as a result of the alleged harassment from those caused by the sexual assault, A.N. responded, "I felt like going to school every day I was being raped all over again. And it was horrible going to school. What happened to me in January [the sexual assault] I'll live with my whole life, but I'll also live with this my whole life. This affected me a lot." Id. at 63.

Mindful that it must defer to the credibility assessments and reasonable factual inferences that may have been drawn by the jury, the Court concludes that the plaintiff presented sufficient evidence to support the conclusion that her daughter suffered sexual harassment that was "severe, pervasive, and objectively offensive." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 653 (1999). The plaintiff and her daughter testified that A.N. was subject to nearly constant peer harassment upon reporting that she had been sexually assaulted by two upperclassmen and, as in the Davis case, the plaintiff contended that such harassment "had a concrete, negative effect on her daughter's ability to receive an education," by preventing her from attending class and walking through campus undisturbed. Id. at 654.

Nor, as the defendant argues, must harassment be "motivated by sexual desire" or be spouted by members of the opposite sex to qualify as sexual harassment.[6] See Doc. #79 at 11-12.

---

[6] While the defendant claims that "most of A.N.'s complaints pertained to name-calling by fellow female students," the Court notes that the plaintiff also presented evidence of harassment by male students.

Defining "sexual harassment" in the context of a Title VII claim, the Second Circuit has held that it "includes 'conduct [that] has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" Petrosino v. Bell Atlantic, 385 F.3d 210, 220-21 (2d Cir. 2004) (quoting Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir. 2001), and 29 C.F.R. § 1604.11(a)).  The Petrosino Court went on to hold that "incessant sexually offensive exchanges . . . and omnipresent sexual graffiti," when viewed as a whole, could constitute severe or pervasive sexual harassment in the Title VII context.  Id. at 221, 223-24.  See also Galderi-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (holding that "[sexual] harassment need not take the form of sexual advances or other explicitly sexual conduct in order to be actionable under Title VII").

Further, the Supreme Court has explicitly held that "sex discrimination consisting of same-sex sexual harassment is actionable" under Title VII.  Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 82 (1998).  While the complained-discrimination must be based on sex, the Oncale Court found that

> a trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.  A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.

Id. at 80-81.  Whatever evidence a Title VII plaintiff chooses to present, "the critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  Id. at 80.  The Oncale Court further

instructed that in evaluating such claims,

> Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Id. at 82.

The Court sees no reason to apply different criteria to the definition of, or the jury's framework for evaluating allegations of, sexual harassment in the Title IX context. See also Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65-66 (1st Cir. 2002) (finding that "the reasoning of Oncale is fully transferable to Title IX cases" and holding that allegations of same-sex sexual harassment are cognizable under Title IX); see also Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999) (discussing precedent establishing that when a victim is harassed because of his or her sex, the harassment constitutes discrimination under Title IX).   The Court finds that the plaintiff presented sufficient evidence for the jury to conclude that A.N. suffered harassment because of her sex that was so severe, pervasive, or objectively offensive as to deprive her of access to the educational opportunities or benefits of East Haven High School. The defendant's motion for judgment as a matter of law on the basis of insufficient evidence of sexual harassment therefore is denied.

> **b.    Evidence of East Haven's Actual Knowledge of Sexual Harassment**

The Court instructed the jury as follows on the second element of Doe's Title IX claim:

> In order to find the Defendant liable, you must also find that it had actual knowledge of any student-on-student sexual harassment.  To show that the East Haven Board of Education had "actual knowledge," the Plaintiff must prove that the harassment was witnessed by or that notice of the harassment was given to an "appropriate person"—an official of the Defendant who at a minimum had

authority to address the alleged discrimination and to institute corrective measures on the Board of Education's behalf.

At trial, Doe testified that after A.N. disclosed her assault to school authorities on March 25, 2002, Doe called East Haven High School "at least three times a week, four times a week." Trans., 5/2/05, pg. 109. During the week of March 25, Doe left telephone messages for East Haven Superintendent Martin DeFelice and also spoke to East Haven High principal Dr. John Smith, to "tell him my concerns" about the harassment A.N. was suffering and "tell him what I wanted" in terms of remedial measures. Id. at 109-112. In that first week following A.N.'s disclosure, Doe also met in person with Dr. Smith: "I said my daughter's coming home every day crying, she can't go to her classes now." Id. at 114. Doe also said that she spoke to A.N.'s guidance counselor Alicia Melillo "almost daily about [A.N.], how her day was going, what classes that she would make it to. I spoke to her a lot about when [assault suspect Robert] Demars entered the guidance office where [A.N.] was being kept secluded or [when] the tennis ball was thrown at her head."[7] Id. at 116. Asked to specify the comments she made to Melillo, Doe said, "I would say to Alicia, my daughter's being called a slut, a liar, a douche bag. That she just slept with two boys. And these two boys are rapists running in the schools. [A.N.] can't go to her classes. She's a high honor student." Id. at 118. Doe also testified that she reported the incident where A.N. was struck by a tennis ball to Dr. Smith. Id. at 128. It was Doe's recollection that she and her daughter had five or six in-person meetings with Dr. Smith and other East Haven High School administrators to discuss the harassment between March and May

---

[7] This testimony was admitted only admitted for the purpose of what notice it may have provided to the defendant, not for its truth, and the Court provided the jury with a limiting instruction to that effect.

2002. Id. at 195-98.

A.N. testified that, beginning the day after her disclosure, "I went to Ms. Melillo and I would tell her, and I started to go there every day and I'd write down– I'd write my statement down and then we'd bring it to Dr. Smith. . . .  I would put [down] the things people called me and who said them."  Trans., 5/3/05, pg. 48.  A.N. also reported her feelings about the harassment to Melillo: "I would tell her how I can't stand walking by them, you know, all the harassment and everything.  I would tell her about it all the time.  And then we'd have meetings and meetings." Id. at 52.  A.N. testified that she too informed both Melillo and Smith about the incident where she was hit by a tennis ball.  Id. at 57.  It was also A.N.'s recollection that she and her mother had approximately five meetings with Dr. Smith to discuss incidents of harassment between March and May 2002.  Id. at 88.

Finally, plaintiff's witness and Connecticut Assistant State's Attorney Maxine Wilensky testified that she had handled the prosecutions of the two students accused of assaulting A.N. Wilensky stated that while her prosecutions were pending, she sent a letter dated May 6, 2002 to East Haven Superintendent Martin DeFelice.  That letter, in part, discussed A.N.'s reports of harassment at school:

> I have spoken to the mother of the complainant . . . and understand the complainant has been harassed and subjected to intimidating behavior as a result of her disclosure concerning the alleged sexual assault.  The actions were perpetrated by fellow students and took place on school property.[8]

---

[8] The letter was introduced at trial as Plaintiff's Exhibit 3 and published to the jury.  At that time, the Court provided a limiting instruction to the jury that "this exhibit has been admitted not for the truth of the matters asserted in it, but only to demonstrate the notice it provided to the defendant.  You are to consider the evidence for that limited purpose only. . . ."  Trans., 5/2/05, pg. 69.

Trans., 5/2/05, pg. 67.

The Court finds that the plaintiff presented sufficient evidence for the jury to conclude that the defendant had actual knowledge of A.N.'s allegations of peer sexual harassment. The defendant's motion for judgment as a matter of law on this ground is denied.

### c.      Evidence of East Haven's Deliberate Indifference to Sexual Harassment

The Court provided the following instruction to the jury on the third required element of a Title IX peer sexual harassment claim:

> Finally, in order to find the Defendant liable, the Plaintiff must prove that the Defendant Board of Education, upon receiving actual notice, was "deliberately indifferent" to the harassment. The United States Supreme Court has held that a Title IX defendant should be found deliberately indifferent only where its "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances." The deliberate indifference standard "does not mean that [the Defendant] can avoid liability only by purging [its] schools of actionable peer harassment or that administrators must engage in particular disciplinary action," but simply that a defendant must respond to acts of known peer harassment in a manner that is not clearly unreasonable. [quoting Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648-49 (1999)]

Doe testified repeatedly that she felt the East Haven Board of Education did nothing in response to her complaints about A.N.'s treatment by her peers. In the first week after A.N.'s disclosure, Doe left telephone messages for East Haven superintendent DeFelice that were never returned:

> . . . I called DeFelice probably sometime later that week. I called him because I couldn't take it anymore with my daughter coming home crying. So I called him and I didn't speak with him, I don't believe I spoke with him, I believe I spoke with the secretary, telling them that my daughter was being harassed in school. And the two rapists were still in her school and I wanted to know why and what they were going to do for her. And I didn't get through to DeFelice. So, no, there was no response. . . . And nobody ever called me, not one phone call.

14

Trans., 5/2/05, pg. 112, 114.  Doe also testified that East Haven High principal Smith was

unresponsive to her concerns: "[W]hen I went to Dr. Smith and I said to him, why not remove,

like especially the science class–I said why can't you take that girl out of the science class that

threatened my daughter and put my daughter back in there.  And he wouldn't remove the one that

made the threat.  He kept [A.N.] in the guidance office." Id. at 123-24.  Doe also recalled

informing Smith that a fellow student had thrown a tennis ball at A.N.'s head: "He really had no

response. Just that, you know, they're keeping her in the guidance office.  Nothing." Id. at 128.

Doe had requested that East Haven administrators send out a memo to the high school

staff regarding A.N.'s allegations of assault and the ensuing investigation, telling them

> not to talk about it and [to] try to control any situation that may arise, because it
> was the thing to talk about in high school.  It was the subject of everywhere you
> went unfortunately for my daughter.  And I asked [DeFelice] to send out a memo
> to his staff or hold an assembly of some kind.  And the memo wasn't sent because
> they didn't want to draw attention to anything.

Id. at 129.  Doe found the school administration's course of action unsatisfying: "Yeah, they gave

her the privilege of staying in the guidance office or being threatened." Id. at 202.  She was also

quite concerned about in-school distribution of the New Haven Register on the day that the

newspaper contained a front-page story discussing A.N.'s assault and the arrest of two suspects:

> So I called up DeFelice[9] and I said why is it that the newspaper is in school, the
> article is printed that two East Haven– two East Haven students were arrested for
> raping a 14-year-old student in East Haven High School.  So I asked him why the
> papers were delivered to the school that day and if he could please hold the
> papers, do not let the students have them.  And he said it was their First
> Amendment right.  So I called Alicia [Melillo] and I tried to get Alicia to beg not
> to get the papers.  And then we couldn't– couldn't stop it. . . .[I]t was just
> devastating.  There was no controlling the situation.

---

[9] Later in her testimony, Doe said that she had misspoken and that this call was made to
East Haven principal Smith.  Id.

Id. at 131-32.

Finally, Doe testified that she had received a copy of the East Haven Board of Education Discipline Policy, which stated that harassment or discriminatory behavior directed to a victim's gender was punishable by out-of-school suspension and possible expulsion, but that to her knowledge, "when my daughter would write down things that would happen, file formal complaints with the guidance counselor of who called her what and when they called her, it's to my knowledge that nobody was suspended for it. . . ." Trans., 5/3/05, pg. 39.[10]

A.N. testified that despite the daily written complaints she submitted to Alicia Melillo, "nothing was done. . . . They told me I could sit in guidance, the guidance office, so I wasn't harassed anymore." Trans., 5/3/05, pg. 51. To A.N.'s knowledge, none of the students that she claimed had harassed her was punished during March or April 2002. Id. A.N. also was deeply concerned about the distribution of the New Haven Register article discussing her assault:

> . . . I called my mom and I told her the papers were out, to see if they could not distribute them that day. And she called and they told her it's their First Amendment right. So later on in that day when I got out of one of my classes everybody had a paper. There was all [sic] print-ups for people who didn't have a paper from the Internet. They even made copies on the copy machine. Only the teachers have a password to the copy machine. They hung it up on the media center door. It was everywhere. [A] substitute teacher read it in class. It was all over the place.

Id. at 53. A.N. complained about the distribution of the article to Smith, but testified "I can't remember him saying– I can't remember him even being concerned a little bit. He didn't really care." Id. at 56.

---

[10] The full East Haven Board of Education Discipline Policy was admitted at trial as Plaintiff's Exhibit 1, and certain sections of that policy were published to the jury. See Trans., 5/2/05, ¶. 237-40.

16

The Court finds that the plaintiff presented sufficient evidence for the jury to conclude that the East Haven Board of Education was deliberately indifferent to A.N.'s allegations of sexual harassment. The defendant's motion for a judgment of law on this ground also is denied.

**B.      Defendant's Motion to Set Aside Jury Verdict and Judgment**

The defendant has filed a separate post-trial motion to set aside the jury's verdict and judgment in this case. It is unclear under what authority the defendant makes this motion. Although the Supreme Court has commented that Fed. R. Civ. P. 59(a) preserves trial courts' broad common law authority to overturn verdicts and order new trials "for any of the reasons for which new trials have heretofore been granted in actions at law", see Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 432-33 (1996), such motions generally are brought under Fed. R. Civ. P. 50(b). See, e.g., Toporoff Eng'rs, P.C., v. Fireman's Fund Ins. Co., 371 F.3d 105, 106 (2d Cir. 2004). Again, the Second Circuit has held that a jury verdict should be set aside only where there is "'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.'" Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992) (quoting Mattivi v. S. African Marine Corp., 618 F.2d 163, 168 (2d Cir. 1980)).

In its motion to set aside the jury verdict and judgment, the defendant argues that the "verdict was legally and logically unsupported by the evidence" on the identical grounds enumerated in its motion for judgment as a matter of law. See Doc. #81 at 1. For the reasons discussed supra, the Court finds that there was sufficient evidence to support the jury's verdict, and denies the defendant's motion to set aside the verdict and judgment on this basis.

17

The defendant also argues that the verdict and judgment should be set aside because the Court gave an erroneous jury instruction on the required element of "deliberate indifference."[11] At the charge conference and following the final charge to the jury, the defendant objected to the Court's failure to include its additional requested language on this element.[12]  Upon review, the Court finds that its instruction did not mislead the jury as to the proper legal standard, nor did it fail to adequately inform jurors of the applicable law.  See Luciano v. Olsten Corp., 110 F.3d 210, 218 (2d Cir. 1997).  Therefore, the defendant's motion to set aside the jury verdict and judgment on the basis of the jury charge is denied.

To the extent that defendant's motion is to be construed as one for a new trial under Fed. R. Civ. P. 59, the Court is mindful that such motions generally should be granted only when "the jury has reached a seriously erroneous result or [the trial court concludes] that the verdict is a miscarriage of justice."  De Falco v. Bernas, 244 F.3d 286, 305 (2d Cir. 2001) (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997)); see also DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) ("Unlike judgment as a matter of law, a new trial may be granted [under Rule 59] even if there is substantial evidence supporting the jury's verdict. . . .  A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.'").  Weighing the evidence itself, the Court does not conclude that the jury's verdict either was seriously erroneous, egregious, or a miscarriage of justice.  Therefore, defendant's motion for a new trial is denied.

---

[11] The Court's instruction on the deliberate indifference element is reproduced in Section II(A)(2)(c), supra.

[12] That objection was orally overruled by the Court.  See Trans., 5/5/05, pp. 132-33.

18

**C.     Plaintiff's Motion for Attorneys' Fees**

42 U.S.C. § 1988 provides that "in any action or proceeding to enforce a provision of. . . [Title IX]. . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  Pursuant to that statute and Fed. R. Civ. P. 54, the plaintiff has moved for attorneys' fees and costs in the amount of $35,546.23.

The defendant has objected to the motion for attorneys' fees on the basis that it was untimely filed.  Federal Rule of Civil Procedure 54(d)(2)(B) states that a motion for attorneys' fees must be filed "no later than 14 days after entry of judgment."  In this case, judgment was entered on May 9, 2005.  The fourteen-day period would have expired on May 23, 2005, while the plaintiff did not file her motion until June 5, 2005.

The defendant, however, had previously timely filed its motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) and its motion to set aside the jury verdict on May 16, 2005. The Second Circuit has held that "the timely filing of a postjudgment motion pursuant to Fed. R. Civ. P. 50(b) . . . automatically 'affects the finality of the judgment'" and therefore that a Rule 54 motion for attorneys' fees is timely "if filed no later than 14 days after the resolution of such a Rule 50(b), 52(b), or 59 motion."  Weyant v. Okst, 198 F.3d 311, 314-15 (2d Cir. 1999). Because the pendency of the defendant's post-trial motions operated to suspend the finality of the Court's judgment, the filing of those motions also suspended the 14-day filing period for the plaintiff's motion for attorneys' fees.  The Court therefore finds the plaintiff's motion to be timely filed, and denies the defendant's objection to a fee award on this basis.

The Court also finds that the plaintiff is a "prevailing party" under 42 U.S.C. § 1988, as the verdict was entirely in her favor.  The proper fees to be awarded such a prevailing party are

determined by multiplying a reasonable hourly rate by the number of hours reasonably expended on the litigation.  See Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).  The product of this calculation is called the "lodestar" figure.  See Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999).  The party requesting fees bears the burden of proving reasonableness by way of an affidavit detailing the time spent working on the case and the fees charged.  See Blum v. Stenson, 465 U.S. 886, 895-96 (1984).

Here, plaintiff's counsel John R. Williams and his former law partner, Norman A. Pattis, have submitted affidavits that they spent 74.8 and 23.55 hours, respectively, preparing and trying this case.  See Doc. #88.  They request a lodestar compensation rate of $350 per hour.  The Court is well acquainted with Attorney Williams' and Attorney Pattis' extensive experience as civil rights litigators in the District of Connecticut.  After considering the compensation rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," and taking judicial notice of the hourly rates recently awarded in the District of Connecticut, the Court finds that hourly rate requested by Williams and Pattis is reasonable.  Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997).  See generally Farbotko v. Clinton County, 433 F.3d 204 (2d Cir. 2005); see also Galazo v. Pieksza, 2006 U.S. Dist. LEXIS 1697, *8-*9 (D. Conn. Jan. 19, 2006), Sony Elecs., Inc. v. Soundview Techs., Inc., 389 F. Supp. 2d 443, 448 (D. Conn. 2005).

The Court also finds that the hours (fewer than 100 in total) claimed by the plaintiff's attorneys are reasonable, if not low, for a case that was filed three years before it proceeded to trial.  Thus, applying the hourly rate determined above to the hours submitted by each attorney results in a final lodestar figure of $34,422.50.  The plaintiff has also requested costs in the

amount of $1,123.73.  The defendant has made no objection to these costs, and the Court also awards them to the plaintiff.

## III.    Conclusion

The Defendant's Renewed Motion for Judgment as a Matter of Law [Doc. #78] and Motion to Set Aside Jury Verdict and Judgment [Doc. #80] are DENIED in their entirety.  The Plaintiff's Motion for Attorneys' Fees [Doc. #88] is GRANTED, and the plaintiff is awarded $34,422.50 in attorneys' fees and $1,123.73 in costs.

So ordered this _31st_ day of March 2006 at Hartford, Connecticut.


_/s/ CFD_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**